## Elliott v. Greenville Coal Company.

(Decided June 9, 1914.)

### Appeal from Muhlenberg Circuit Court.

Master and Servant—Safe Places—Servant Voluntarily Selecting Dangerous Place.—Where an entry in a mine was unsafe on account of the defective condition of the roof of the entry, and a miner, knowing the condition of the roof, voluntarily went out this entry when he could have gone through an entry that was safe, he assumed the risk of being injured by falling slate, and the master was not liable for injuries he sustained.

MILTON CLARK, C. A. DENNEY for appellant.

TAYLOR & EAVES and HELM BRUCE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant, Elliott, as plaintiff below, brought this suit against the appellee coal company to recover damages for personal injuries sustained on account of its alleged failure to exercise ordinary care to furnish him a reasonably safe place in which to go to and from a place in its mine in which he was working, averring that as a result of this breach of duty he was injured by the

falling of slate while going through an entry on his way out of the mine.

On the conclusion of the evidence for the plaintiff, the trial court directed a verdict for the defendant company, and the only question before us is the correctness of this ruling. The only evidence in the record that we need notice is that of the plaintiff and George Clements.

The plaintiff, in his own behalf, testified as follows: "I was shooting coal, and I lighted my shot and started out down the entry, and a piece of slate fell and struck me on my arm and on my leg and cut me. Q. What room had you been working in that day? A. 17 and 16. Q. On what entry? A. Third east entry. Q. And where were you when this slate fell? A. My best recollection down there somewhere between 6 and 7. Q. On what entry? A. Third east. Q. Where were you going? A. Going outside. Q. Was that the usual way to go from room 16 and 17 to the outside? A. Yes, sir. Q. Was that entry used for that purpose? A. Yes, sir. Q. Who used the entry for that purpose? A. Everybody that worked in that entry. Q. Did you know anything about the condition of the roof in that entry? A. I knowed it was always falling, and had been falling. Q. You knew stuff had been falling from the roof? A. Yes, sir. Q. Did you know the condition of the roof where this fall occurred that day? A. No, sir. Q. Who looks after the roof of that entry? A. They have timber and slate men supposed to look after that. Q. Have a boss with that crew? A. Yes, sir. Q. Who is the boss down there? A. I think it is Mr. Olden. Q. Did you see him there anywhere that day? A. No, sir. Q. You know whether he inspected the roof of that entry that day? A. No, sir; I do not. Q. How were you standing at the time this slate fell upon you? A. I was walking with my hands behind me and I stooped over kinder like I always do. Q. How come you to stoop over? A. It was low and I had to stoop over. Q. Is the roof sufficiently high to stand straight and walk out? A. Some places it is and some it is not. Q. At that particular point? A. Pretty bad roof. Q. How high was the roof above you at that place? A. I don'e know; looked like two or three feet. Q. You mean that point was two or three feet higher than the rest of the entry along there? A. Yes, sir. Q. Why was that so? A. Because it had fallen there on the 8th and they had not

fixed it. Q. What kind of slate fell on you? A. It looked to be about so long. Q. Did you see it before it hit you? A. No, sir. Q. Did you have time to get from under it? A. No, sir. Q. What did you do when the slate fell on you? A. I hallooed for George Clements; me and him left my room together. Q. Where did he separate from you? A. He went through the break through on 4th East. Q. He had gone across in another entry? A. Yes, sir. Q. Did he come to you? A. No, sir; he answered but didn't come. Q. Anybody come to you? A. No, sir; me and him only ones in there in that part of the mines. Q. You didn't know that this slate was falling out and that this was a dangerous place, did you? A. I did not think about it right then; I knowed it had been falling. Q. You say it had been falling? A. Yes, sir. Q. When? A. It fell out down there on the 8th and we were knocked out of work on account of the fall. Q. How long before was that? A. On the 8th; that was the day we was knocked out of work. Q. On the 8th of March, and you got hurt on the 10th? A. Yes, sir. Q. You say it was after four o'clock? A. Yes, sir. Q. And you and George Clements had started out of the mines together? A. No, sir. I started out; he had three entries to shoot on before he come out. Q. You and he came up the entry part of the way together? A. No, sir; just to the track. Q. He went off on the 4th East entry? A. Yes, sir.''

George Clements testified: ''Had you seen him just before he got hurt? A. Yes, sir; left him at the head of the 3rd East entry. Q. That about room 16 or 17? No, sir; farther up. Q. What direction was he going when you left him? A. He had started out. Q. Going outside from where you left him, would he go along 3rd East entry going out? A. Yes, sir. Q. That is the usual and direct route to go? A. Yes, sir. Q. Did you pass along that entry between rooms 6 and 7 along there next day? A. Yes, sir; went by there that evening. Q. When did you next go by there? A. I suppose next morning. Q. State whether or not there was a bad place along that entry about 6 or 7? A. Yes, sir. Q. In passing there that evening or next morning, did you find any evidence of slate having fallen? A. Of course slate was down there, but it had been falling before that. Q. You saw slate down there next morning? A. Yes, sir. Q. Whose duty was it to look after the roof of that

entry? A. Mr. Olden's; that is his job; he timbers and takes down roof and takes down loose slate. Q. Had you seen him that day anywhere in that entry? A. No, sir. Q. You know whether he inspected that entry any time that day? A. I didn't see him; don't know.''

This evidence shows beyond doubt the existence of two things: First, that the roof of the entry where plaintiff was injured was unsafe and dangerous, and, second, that the plaintiff knew its condition before he was injured. It further appears that an outlet from the mines was furnished by an entry other than the one with the defective roof, and that if plaintiff had gone out through this entry he could have escaped the danger attending passage through the entry with the defective room.

Under these facts we find, as a matter of law (1) that the defendant company was negligent in failing to keep the roof of the entry, in which the plaintiff was injured, in a reasonably safe condition, but that this negligence was not the direct or proximate cause of the plaintiff's injury; (2) that the plaintiff had two ways by which he could go out of the mine—one a safe way and the other a dangerous way, and that he voluntarily selected the dangerous way, and therefore he cannot recover damages for the injuries he sustained. It has been written in numbers of cases that where there is open to a servant the selection of a safe and an unsafe way of using implements or premises, and with knowledge of the conditions, he voluntarily and knowingly selects the unsafe way, he takes the risk of any accident that may happen to him.

The judgment is affirmed.